## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

LESLIE LEHR,                          )
                                      )
      Plaintiff,                 )
                                      )
    v.                            )          No. 4:19-CV-942 RLW
                                      )
NIKE IHM, INC., and                   )
NIKE AIR MI MISSOURI,                 )
                                      )
      Defendants.                )

## <u>MEMORANDUM AND ORDER</u>

This employment discrimination matter is before the Court on remaining Defendant Nike IHM, Inc.'s ("Nike") Motion for Summary Judgment.[1]  (ECF No. 33.)  Plaintiff Leslie Lehr ("Plaintiff") opposes the Motion and it is fully briefed.  Plaintiff filed this action in the Circuit Court of St. Charles County, Missouri, in March 2019.  Nike removed the case to this Court based on federal question jurisdiction pursuant to 28 U.S.C. § 1441.

Plaintiff is a white woman who was employed by Nike as a machine operator at its manufacturing facility in St. Charles, Missouri, from April 17, 2017 to August 13, 2018.  Plaintiff's Petition asserts three counts against Nike arising out of her employment: Count I—Race/Hostile Work Environment; Count II—Gender (Sex)/Hostile Work Environment; and Count III—Retaliation/Hostile Work Environment.  Each count is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, <u>et</u> <u>seq.</u> ("Title VII").  Nike moves for summary judgment on all of Plaintiff's claims.  Because Nike establishes that no genuine issues of material

---

[1]Plaintiff dismissed her claims against Defendant Nike Air MI Missouri without prejudice on July 31, 2019.  <u>See</u> Order of Partial Dismissal (ECF No. 10).

fact remain and it is entitled to judgment as a matter of law, the Motion for Summary Judgment will be granted in all respects.

**Legal Standard**

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). The substantive law determines which facts are critical and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome will properly preclude summary judgment. Id. Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex Corp., 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248. "The nonmoving party may not rely on allegations or denials" but rather "must substantiate her allegations with sufficient probative evidence that would permit a finding in her favor on more than mere speculation or conjecture." Carter v. Pulaski Cnty. Special Sch. Dist., 956 F.3d 1055, 1059 (8th Cir. 2020) (quoting Ball v. City of Lincoln, Neb., 870 F.3d 722, 727 (8th Cir. 2017) (cleaned up)). "Small factual disputes about the underlying events . . . could only create the 'metaphysical' kind of doubt that the Supreme Court decried in Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)." Main v. Ozark Health, Inc., 959 F.3d 319, 327 (8th Cir. 2020) (cleaned up; quoted case omitted).

2

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in her favor. Celotex Corp., 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Torgerson, 643 F.3d at 1042 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

**Facts**[2]

I. Nike's Business and Relevant Policies

Nike is a global marketer and distributor of athletic footwear, apparel, and equipment, operating in more than 160 countries around the globe, and has a manufacturing plant in St. Charles, Missouri. (Jason Politte Decl. ¶ 3, ECF No. 34-2.) Nike maintains an Equal Employment Opportunity ("EEO") policy prohibiting discrimination and retaliation. During Plaintiff's employment in 2017 and 2018, the EEO Policy was in the Code of Ethics and stated that Nike "is committed to maintaining a work environment free from unlawful discrimination, including

---

[2] The facts, including citations to the record, are taken largely from Defendant Nike's Statement of Uncontroverted Material Facts ("SOF") (ECF No. 36). Plaintiff admitted the vast majority of these without qualification (ECF No. 42). Plaintiff filed a Statement of Additional Material Facts in Opposition to Defendant's Motion for Summary Judgment (ECF No. 43), a number of which cite solely to Plaintiff's Declaration (ECF No. 44). Nike asserts that Plaintiff's Declaration is a self-serving, sham affidavit that contradicts her sworn deposition testimony. It is true that a "party should not be allowed to create issues of credibility by contradicting his own earlier testimony. But an affidavit may be submitted to clarify ambiguities or confusion in deposition testimony." Taylor v. Cottrell, Inc., 795 F.3d 813, 818 (8th Cir. 2015) (cleaned up); see Button v. Dakota, Minn. & Eastern RR Corp., 963 F.3d 824, 830 (8th Cir. 2020) ("An affidavit is a sham affidavit if it contradicts prior testimony or is a sudden and unexplained revision of testimony that creates an issue of fact where none existed before. However, if the affidavit merely explains portions of a prior deposition that may have been unclear, it is not a sham affidavit.") (cleaned up, citations omitted). To the extent any facts set forth in Plaintiff's Declaration contradict her deposition testimony or are a sudden and unexplained revision of that testimony, the Court will not consider them. But where the facts in Plaintiff's Declaration supplement or seek to explain her deposition testimony, the Court considers them. Specific issues relating to facts contained in Plaintiff's Declaration are discussed *infra*.

harassment based on sex, sexual orientation gender identity, gender expression, race, age, religion, disability, ethnic group or any other protected status." (Steven Dawson Decl. ¶ 7, ECF No. 34-3; Pl. Dep. 347:14-348:3 & Pl. Dep. Ex. M, ECF No. 34-4.)

Nike also maintains a separate policy titled "A Matter of Respect; Nike's Anti-Harassment and Anti-Discrimination Policy," which states that Nike "prohibits discrimination and harassment, seeks to prevent harassment and provides employees with an effective complaint process" and states that the Matter of Respect "policy applies to everyone at NIKE regardless of position and will be consistently enforced." (Pl. Dep. 346:22-347:25 & Pl. Dep. Ex. C.) Nike's A Matter of Respect policy is published to employees in Nike's U.S. Employee Handbook and is posted on the company's intranet. (Pl. Dep. 346:22-347:25 & Pl. Dep. Ex. L.)

Nike's A Matter of Respect policy says that "if you experience, witness, or learn of harassment in the workplace you must immediately report the harassment to your Employee Relations Specialist, your HR Business Partner, or your immediate supervisor.'" (Pl. Dep. Ex. L.) If none of those individuals are available, if the employee is uncomfortable reporting to any of these individuals, or if the employee is dissatisfied with any of these individual's responses, the policy states that the employee should report the harassment to the Director of Employee Relations or to the Director of Corporate Human Resource Services. (Pl. Dep. at 346:22-347:25 & Ex. L.) The policy further says that all complaints will be promptly investigated and, based on the outcome of the investigation, Nike will take immediate and appropriate corrective action. (Pl. Dep. 346:22-347:25 & Pl. Dep. Ex. L.)

II.  <u>Plaintiff's Employment With Nike</u>

A. *Plaintiff's Employment History with Nike and Familiarity with Nike Policies*

On April 20, 2017, Nike hired Plaintiff as a Plastic Component Operator in the plastics manufacturing department of its St. Charles, Missouri facility. (Pl. Dep. 29:10-11, 33:20-34:15.)

Plaintiff was initially assigned to work on the C shift, working Friday, Saturday, and Sunday from 5 a.m. to 5 p.m., and reporting to Vicky Lewis (white, female).  (Pl. Dep. 35:1-22, 40:11-21.)

At the outset of her employment with Nike, Plaintiff received a copy of Nike's then-current EEO and A Matter of Respect policies and signed an acknowledgment that stated she had received, read, understood, and agreed to comply with the A Matter of Respect Policy, and she had "been informed of the location of the Nike U.S. Employee Handbook on the company intranet or ha[d] received a printed copy." (Pl. Dep. 347:14-348:3 & Pl. Dep. Ex. M; Dawson Decl. ¶ 7 & Decl. Ex A.)

During Plaintiff's initial two months working at Nike, employees assigned to train her reported to Ms. Lewis that Plaintiff was not taking the trainers' suggestions.  (Pl. Dep. 53:19- 54; Vicki Lewis Dep. 22:25-23:17, ECF No. 34-5.)  In turn, Plaintiff complained about her trainers. (Pl. Dep. 53:19-54.)  Ms. Lewis counseled Plaintiff about not taking the trainers' suggestions and not being a good team member.  (Pl. Dep. 53:19-54; Lewis Dep. 22:25-23:17.)

Between July 1, 2017, and August 14, 2017, Plaintiff took an approved medical leave of absence.  (Pl. Dep. 58:21-59:4.)  In August 2017, Nike reassigned Plaintiff to work in the Zoom Department, still on the C shift, but now reporting to Jason Politte (white, male).  (Pl. Dep. 40:11-21; 58:21-23.)  The majority of Plaintiff's co-workers on the Zoom C shift were Black.  (Jason Politte Dep. 20:6-16, ECF No. 34-8; Pl. Decl. ¶ 6, ECF No. 44-1.)  In her position in the Zoom Department, Plaintiff was responsible for operating equipment, including laminating machines that manufacture air bags used in Nike sneakers.  (Pl. Dep. at 29:10-11, 33:20-34:15.)

On November 4, 2017, Plaintiff requested a transfer to the A shift but her request was not granted at that time because there was not an opening.  (Pl. Dep. 87:23-25; Politte Dep. Ex. 1.)

Prior to filing this lawsuit, Plaintiff testified that nobody at work at Nike really talked to her during November 2017.  Plaintiff explained that "there was a group of people that had been

5

there for a length of time, like any job" and she "never really [felt] a part of that group," but Plaintiff was "okay with that.  I was just there to do a job." (Pl. Workers' Comp. Dep. 39-40, Apr. 30, 2018, ECF No. 34-6 ("Pl. WC Dep.").)  Plaintiff later testified in this case that her colleagues shunned her because she was "got pegged as a racist" for voting for President Trump.  (Pl. Dep. 314:17-18.)

B. *Plaintiff's Complaints About Loud Rap Music*

During Plaintiff's employment, Nike permitted employees at the St. Charles facility to play music while working.  (Pl. Dep. 66:3-7, 334:11-345:19 & Pl. Dep. Ex. K.)[3]  Nike maintained an Electronic Device Policy that stated in part, "Please remember, if your co-workers do not like the volume of the radio or it can be heard outside the immediate work area it may be too loud.  The type of station or music you are listening to must not be offensive to anyone.  It is your responsibly to either reach an agreement on the station/music or remove it from the work area." (Politte Decl. ¶ 5; Pl. Dep. 344:11-345:19 & Pl. Dep. Ex. K) (emphasis in original).

In approximately September 2017, Plaintiff told her immediate supervisor Mr. Politte that she felt the music played by the other employees was "just too loud." (Pl. Dep. 60:12-25; Politte Dep. 24:17-19.)  Plaintiff and the other workers on C shift wore earplugs while operating machinery in the manufacturing environment because of OSHA requirements, and Plaintiff wore a second layer of ear protection, but the music was still too loud.  (Pl. Dep. 61:1-14, 92:18-25.) Plaintiff testified in her prior workers' compensation proceeding that the "loudness" of the music was her "number one" concern and "then probably the content and then the words which was like cuss words." (Pl. WC Dep. 30.)

---

[3]Plaintiff admits this fact but states that Deposition Exhibit K was not filed.  This is incorrect, as Exhibit K was filed.  See ECF No. 34-4 at 134.

Plaintiff also told Mr. Politte that the songs contained curse words, specifically "the 'N', the 'F,' and the 'MF,'" and he responded, "It's supposed to be a radio station." (Pl. Dep. 61:5-24.) Plaintiff told Mr. Politte she did not think the music was playing from a radio station because it was "not censored." (Id. 61:25; Pl. Dep. Ex. A.)

Plaintiff testified that on other unspecified dates, she complained to Mr. Politte and a Zoom department Lead named Keith Loeffler (white; male) that the type of music being played was racially hostile because of lyrics that were "very aggressive" and "talking about gangs," "talking about police," "things about white people," "shootings and guns," and "black gangs and white people and shoot the police." (Pl. Dep. 40:11-21; 113-114.)  When asked what the message was that she was hearing, Plaintiff testified, "The message I heard was –I mean, it was –it was—it was black gangs and white people and shoot the police and – I wish I knew the name of some of these songs.  They're—like I said I don't think they're allowed on the radio, but definitely they're coming from somewhere.  These are the things I heard.  Again, if you want to listen to it outside of work –this is a work environment.  I don't want to it hear it at 6:00 in the morning." (Id. 115:1-9.)

Plaintiff's complaints about the music were not related to any particular employee; rather, she testified that "everybody" played music loudly and from non-radio sources. (Pl. Dep. 69:20-70:12-17.)  Plaintiff admitted that "white young kids . . . listen to rap music." (Pl. Dep. 116:5-117:4.)  Plaintiff was not aware of anyone else bothered by the music.  (Pl. Dep. 75:20-24.)

To address Plaintiff's concerns about the music, Mr. Politte called a meeting of all employees on Zoom C shift the day after Plaintiff complained to him.  He read the Electronics Device policy and directed the employees to keep the music at a lower level, to agree on the music being played, or turn it off.  Additionally, employees were not allowed to play music other than from the radio, which the parties refer to as uncensored or non-censored music.  (Politte Dep. 26:1-

27:12, 37:1-13, 41:2-23; Pl. Dep. 60:14-16, 101:14-19; Pl. WC Dep. 34.)  During that meeting, a Black male employee asked who complained about the music, but Mr. Politte did not tell the employees on Zoom C shift that Plaintiff or any other employee had complained about either the volume or style of music.  (Politte Dep. 26:1-27:12; Pl. Dep. 60:14-16; 102:1-25.)  A Black female employee named Nikisha Mosley was also at the meeting.  (Nikisha Mosley Dep. 15:2-11, ECF No. 49-3.)

For approximately two weeks after the meeting, Plaintiff did not hear offensive or uncensored music.  (Pl. Decl. ¶¶ 11, 21.)  It was Mr. Politte's practice while walking the floor to enforce the Electronic Device policy if he heard music that he believed to be "uncensored" by reminding employees of the policy and turning off the "uncensored" music.  (Politte Dep. 37:10-22, 42:3-16.)  Plaintiff admits that if Mr. Politte or other supervisors were in the work area the offensive or uncensored music usually "wouldn't be happening."  (Pl. Dep. 74:21-23; Pl. Dep. Ex. B at 3; Pl. Decl. ¶ 10.)  Mr. Politte never discipline anyone for playing uncensored music.  (Politte Dep. 42:17-43:1.)

When Plaintiff's coworkers began playing uncensored rap music again, Plaintiff complained to Mr. Politte and he told her to deal with it herself.  (Pl. Decl. ¶ 23.)[4]  Plaintiff testified

---

[4]Nike contends the statement in Plaintiff's Declaration that Mr. Politte told her to deal with it herself is not supported by the record and is contradicted by the admissible evidence, SOF ¶¶ 25-27.  When viewed in the light most favorable to Plaintiff, the Court finds Plaintiff's post-deposition statement does not contradict SOF ¶¶ 25-27, and is consistent with relevant portions of her deposition testimony cited above, albeit with a somewhat different, more negative characterization.  The Court agrees with Nike, however, that the following statement in paragraph 29 of Plaintiff's Declaration is contradicted by the record:  "Politte agreed that Plaintiff's only recourse through him with regard to the music is 'every time it happens, she needs to go tell you.'" (Politte Dep. 37:23-38:1.)  This Declaration statement omits that Mr. Politte thereafter testified during questioning by Plaintiff's counsel, "I'd like to go back to the question before if that's possible.  Q. Sure.  A. Okay.  In regards to what she can do if there are [sic] a violation or if she's in a situation any supervisor or lead person she could also go to.  Okay.  I just wanted to clear that up.  Q. Okay.  And she also could go to the HR manager, correct?  A. Yes."  (Politte Dep. 38:9-18.)  Further, it is uncontroverted that Nike's A Matter of Respect policy identifies multiple avenues for Nike employees to report harassment, and that Plaintiff was aware of this policy.

she had been told to "try to work it out" and "try to resolve the situation." (Pl. Dep. 120:14-16; 121:6-9.) Plaintiff also testified that Mr. Politte said, "'When you get into a work area and you put a boombox, let's all agree on what we're listening to and the station.'· And it states that kind of in the policy." (Pl. Dep. 159:13-16.)·

On Friday, November 17, 2017, Plaintiff emailed the onsite Human Resources Manager, Olivia Lindsey (white, female), about music in the workplace. In her email, Plaintiff reported "loud rap music being played again" and said that the volume and the "type of music is very distracting." Plaintiff further stated that the music was "not censored." (Pl. Dep. 76:5-10, 95:3-6, 97:1-100:16, 101:14-19; & Ex. Pl. Dep. A.) Plaintiff did not describe any lyrics that she found offensive in her November 17, 2017 email to Ms. Lindsey. (Pl. Dep. 76:5-10, 95:3-6 & Pl. Dep. Ex. A.)

Plaintiff testified she did not believe or mention in her email of November 17, 2017, that the music being played was somehow racially motivated. (Pl. Dep. 81:12-15.) Plaintiff testified she did not intend her November 17, 2017 email to be a complaint that her work environment was racially hostile because of the music being played. (Pl. Dep. 101:22-25 & Pl. Dep. Ex. A.)

In her November 17, 2017 email, Plaintiff also said that during a meeting held by Mr. Politte, an unidentified Black male employee asked who had complained about the music, but she did not want anyone to know it was her. (Pl. Dep. 94:21-96:22, 102:1-25 & Pl. Dep. Ex. A.) Plaintiff testified that the employee she referred to in her November 17, 2017 email was not a manager or a Lead. (Pl. Dep. 102:1-103:8.)

Plaintiff testified in her deposition that the music played by her co-workers included the "N," "MF," "F," "white," and "police," words and that "it was very violent. Talking about gangs." (Pl. Dep. 82:10-17.) Plaintiff said "maybe everybody's perception of what appropriate content is

-- maybe it's different.  Maybe they -- maybe African-American [sic] that listen to that kind of music think that's appropriate.  Maybe -- I don't know." (Pl. Dep. 83:14-15.)[5]

Ms. Lindsey, the HR manager, was out of the office on paid time off from November 17, 2017, through November 27, 2017.  (Dawson Decl. ¶ 10.)

C. *Plaintiff's Incident With a Coworker Over a Radio*

On Sunday, November 26, 2017, Plaintiff was involved in an incident with coworker Nikisha Mosley (Black, female), while they were both working in the Hot Melt area of the Nike facility.  (Pl. Dep. 106:12-107:3.)  Plaintiff had never worked with or spoken to Ms. Mosley before November 26, 2017. (Pl. Dep. 158:15-161.)

The incident arose out of rap music Ms. Mosley was playing on the personal radio she had brought to work.  (Pl. Dep. 115:23-116:3, 120:23-121:9; Lewis Dep. 37:16-18; Pl. WC Dep. 39 & 66; Nikisha Mosley Dep. 16:14-18:10, ECF No. 34-7.)  Plaintiff believes that Ms. Mosley played the rap music to aggravate her, but admits this belief is based on her own speculation.  (SOF ¶ 41; Pl. Dep. 158:15-161:4.)  Ms. Mosley and Plaintiff exchanged words about the music, including Plaintiff telling Ms. Mosley that she did not "like this type of music," and then specifying "rap

---

[5]Plaintiff states for the first time in her Declaration, "On a daily basis (except for the short period following the meeting), I was subjected to music containing the following words and phrases: pussy, bitch ho, slut, fuck, dick, suck my dick, fuck that ass, fuck that bitch, beat that bitch's ass, fuck that bitch up, mother fucker, cracker, and other offensive words and phrases."  (Pl. Decl. ¶ 12.)  Nike objects that this statement is not supported by admissible evidence because Plaintiff never disclosed this information in discovery.  The Court agrees the record contains no indication that Plaintiff previously testified as to any sexually explicit content in the lyrics she heard at work, and none of the written complaints she submitted to Nike contained these or other specific examples of sexually explicit content she found offensive.  That said, Plaintiff's Declaration does not state she ever told anyone at Nike that she heard these sexually explicit words in the music.  Plaintiff's Declaration states only that she heard these words, and told Mr. Politte the music being played contained offensive content and "she described the offensive content to him," id.  ¶¶ 15-19.  Plaintiff's Declaration does not state that she actually reported any of the lyrics listed in paragraph 12 to Mr. Politte, as opposed to the "N," the "F," and the "MF" words she testified to in her deposition.  As a result, the Court finds that while paragraph 12 of Plaintiff's Declaration is not a sham affidavit, it does not raise a genuine issue of material fact as to whether she informed anyone at Nike of particular sexually explicit lyrics in the music she heard at work.

music" when Ms. Mosley asked what kind of music she did not like.  (Pl. Dep. 115:23, 116:5-117:4.)

At one point when Ms. Mosley temporarily left the work area, Plaintiff walked over to Ms. Mosley's radio to unplug it so that she could move it further away from her.  (Pl. Dep. 121:10-16; Lewis Dep. 39:1-4.)  Ms. Mosley came back and saw Plaintiff trying to unplug the radio and tried to stop her.  Ms. Mosley grabbed Plaintiff's arm and waist and forcefully pulled her backwards away from the radio.  Ms. Mosley was in physical contact with Plaintiff for about ten seconds.  Although Plaintiff was wearing a long-sleeved hoodie, she had marks on her arm as a result of being grabbed there by Ms. Mosley.  (Pl. Dep. 121:17- 127:15; Politte Dep. 47:14-48:4.)

The altercation quickly ended and both Plaintiff and Ms. Mosley brought the incident to the attention of their supervisor, Mr. Politte.  (Pl. Dep. 123:1-127:15; Politte Dep. 44:19-23.)  Mr. Politte asked a second manager, Vicky Lewis, to join him when meeting with Plaintiff and Ms. Mosley about the incident.  (Politte Dep. 44:17-45:10; Lewis Dep. 36:1-5; Pl. Dep. 127:4.)

Ms. Lewis and Mr. Politte together spoke to Plaintiff without Ms. Mosley in the room and similarly spoke with Ms. Mosley without Plaintiff in the room.  (Politte Dep. 45:17-46:2; Lewis Dep. 36:21-37:11; Mosley Dep. 29:25-30:10.)  After the supervisors listened to both employees' accounts of the incident, all four of them met together in the same office and Ms. Mosley apologized to Plaintiff.  (Politte Dep. 56:13-21; Mosley Dep. 29:25-30:10; Lewis Dep. 51:1-8.)

Ms. Lewis asked Plaintiff and Ms. Mosley if they were each okay and they both said they were and further said they were comfortable returning to work together.  Ms. Lewis therefore asked them to return to their work area.  (Pl. Dep. 134:6-8, 135:21-136:3; Politte Dep. 56:3-21; Lewis Dep. 51:1-8.)  Although Plaintiff does not dispute that she may have told Ms. Lewis and Ms. Politte she was comfortable working with Ms. Mosley after the incident, Plaintiff testified she may have done so just to get out of the room.  (Pl. Dep. 135:2-136:3.)

11

Mr. Politte testified that he and Ms. Lewis "thought there was unwanted touching from [Ms. Mosley] to [Plaintiff.]" (Politte Dep. 56:5-6.) Mr. Politte and Ms. Lewis did not give Plaintiff any indication that a further investigation would be conducted or that Ms. Mosley would be disciplined. (Pl. Decl. ¶ 34.) Plaintiff admits that Nike issued Ms. Mosley corrective action for having physically touched Plaintiff during the argument. (SOF ¶ 52.) In the warning, Ms. Mosley was advised that the "failure to make immediate and sustained improvement will result in further corrective action up to and including termination." (Politte Dep. 65:14-68:11 & Dep. Ex. 8; Mosley Dep. 32:18-33:17.)

Ms. Lewis counseled Plaintiff for her role in the incident and said she should not touch another employee's belongings without permission. (Pl. Dep. 128:22-25; Politte Dep. 56:6-12.) Plaintiff was not disciplined. To protect against a recurrence or further escalation of the dispute, Ms. Lewis asked Plaintiff and Ms. Mosley to keep the conversation confidential and not to further discuss the matter. (Pl. Dep. 130:11-14; Lewis Dep. 51:11-17.)

Plaintiff felt like Ms. Mosley had attacked and assaulted her, and she did not want to go back to the work area. After the meeting ended she left and went to the bathroom and then told Mr. Politte she did not feel well and was going home. (Pl. Dep. 134:6-135:9.) Plaintiff then called the police at her husband's urging but decided not to press charges out of fear of retaliation at work. (Pl. Dep. 136:13-25; Pl. Decl. ¶¶ 36-37.)

Plaintiff never returned to work on the C shift after the incident with Ms. Mosley. (Pl. Dep. 282:3-10.) The next day, Monday, November 27, 2017, Plaintiff reported the incident to Nike's Employee Relations group by submitting a complaint through the Nike Human Resources Direct email address. (Pl. Dep. 144:5-12; & Pl. Dep. Ex. B.) Plaintiff asked to be moved to A shift and that Ms. Mosley's employment be terminated. (Pl. Decl. ¶ 40; Pl. Dep. Ex. B.)

Nike Inc.'s[6] Employee Relations Department initiated an investigation that was conducted by Patrick Benton (white, male), Senior Employee Relations Specialist; and Kimberly Groulx (white, female), Director of Investigations Services and Support.  (Kimberly Groulx Decl. ¶ 8, ECF No. 34-9.)  On November 30, 2017, Mr. Benton and Ms. Groulx spoke to Plaintiff about the incident, and Plaintiff stated she did not feel safe returning to the C shift where she would need to interact with Ms. Mosley.  (Groulx Decl. ¶9.)  To address Plaintiff's concerns, Mr. Benton and Ms. Groulx offered her an immediate opening available on an evening shift, working from 5 p.m. to 5 a.m. (Groulx Decl. ¶ 10; Pl. Dep. 147:14-148:24.)

Plaintiff declined the offer because she said that she did not feel safe working in the evening due to the "demographics" of the evening shift employees.  (SOF ¶ 61; Groulx Decl. ¶ 11.) Plaintiff also told Mr. Benton and Ms. Groulx that she was "paranoid," she was a minority on the evening shift, and most people on that shift are "blacks from the same place."  (Groulx Decl. ¶ 11; Pl. Dep. 147:14-148:24.)  Plaintiff stated that she would not return to work at Nike until she could be transferred to the "A" day shift, working Monday through Thursday from 5 a.m. to 5 p.m. (Groulx Decl. ¶ 12; Pl. Dep. 147:14-148:24.)

At the conclusion of the investigation and consistent with the conclusion reached by Mr. Politte and Ms. Lewis, Nike Employee Relations corroborated Plaintiff's claim that Ms. Mosley had touched Plaintiff on the arm when Plaintiff tried to unplug Ms. Mosley's radio.  (Groulx Decl. ¶ 15.)  To address Plaintiff's concerns, Nike granted Plaintiff's request to transfer to the A shift on Monday, December 3, 2017, less than a week after the investigation commenced.  (Pl. Dep. 144:14-18, 282:3-10; Groulx Decl. ¶ 13.)  Nike advised Plaintiff that even though she was transferring to another shift to which Ms. Mosley was not assigned, Plaintiff may still see Ms.

---

[6]Nike, Inc. is the parent company of Defendant Nike IHM, Inc.  (Groulx Decl. ¶ 6.)

Mosley if either employee worked overtime or due to other unforeseen reasons.  Plaintiff advised that she understood and accepted that this may happen.  (SOF ¶ 65; Groulx Decl. ¶ 14.)

Plaintiff never told anyone at Nike during the investigation or at any other time during her employment that Ms. Mosley's actions during the November 26, 2017, incident were based on Plaintiff's race, gender, or any other protected characteristic.  (SOF ¶ 66; Groulx Decl. ¶ 16; Politte Decl. ¶ 6; Pl. Dep. Ex. B.)

### D. *Plaintiff's Leave of Absence and Resignation*

On Thursday, January 25, 2018, approximately 60 days after the incident with Ms. Mosley, Plaintiff was working the A Shift and saw Ms. Mosley in her work area talking to other Nike employees.  (Pl. Decl. ¶ 63.)[7]

Ms. Mosley did not speak to or look at Plaintiff.  (Pl. Dep. 232:8-16.)  Ms. Mosley was talking to two female employees, moving her hands, and "her facial expressions weren't like happy," but Plaintiff could not hear what she said.  Plaintiff "felt a little unsafe" with Ms. Mosley there because she had "attacked her," and Plaintiff did not believe Ms. Mosley was scheduled to work the A shift and therefore should not have been in the building on her day off.  (Pl. Dep. 234:15-235:2.)  Plaintiff concluded that Ms. Mosley came to the building for the sole purpose of intimidating and harassing her.  (Id. 240:24-241:9.)

Plaintiff reported her concern to her supervisor Carey Godi (white, male), who went to speak to the supervisor in the area where Ms. Mosley was, to find out if she was working.  (Pl. Dep. 235:18-24.)  After Godi spoke to Ms. Mosley, he told Plaintiff she was there to pick something up and Godi told Ms. Mosley she could wait in the cafeteria and Plaintiff returned to

---

[7]There is a factual dispute in the record as to whether Ms. Mosley was present at Nike on Thursday, January 25, 2018.  For purposes of summary judgment the Court credits Plaintiff's testimony that Ms. Mosley was present during the A shift.

work  (Pl. Decl. ¶ 48.)  The two female employees Ms. Mosley had been speaking with, who Plaintiff had never talked to, then came into Plaintiff's work area and were looking at her and she "did not feel comfortable at all."  (Id. 240:4-13.)  One of the women said, "They made her wait outside," and the other said, "Not a good move."  (Pl. Decl. ¶ 50; Pl.'s Dep. Ex. D.)  Then a third female employee Plaintiff had never seen before came into her work area.  (Pl. Dep. 240:4-11. ¶ 51; Pl.'s Dep. Ex. D.)  Plaintiff did not feel comfortable and got her things and went to find her supervisor Mr. Godi and told him she wanted to be escorted out of the building to her car.  (Id. 240:14-23.)

Plaintiff testified that while walking to her car with Mr. Godi, she saw a Black woman sitting in her car and was afraid it was Ms. Mosley.  (Pl. Dep. 241:19-242:25.)  When the woman exited her vehicle, Plaintiff realized it was not Ms. Mosley.  (Id. 240:13-242:25.)  Prior to this, Mr. Godi, Plaintiff's supervisor on the A shift, was not aware of the previous incident between Ms. Mosley and Plaintiff and was not aware Plaintiff had previously  made complaints about music on the workplace.  (Pl. Dep. 244:20-22; Carey Godi Dep. 15:10-22, ECF No. 34-10.)

Plaintiff was not scheduled to work on Friday, January 26, 2018, because her regularly scheduled A shift hours were Monday through Thursday.  (Dawson Decl. ¶ 12; Pl. Dep. 42:23-25.)  On the evening of Friday, January 26, 2018, Plaintiff emailed Mr. Benton (white; male) and Nike Employee Relations complaining that Ms. Mosley had come to her work area and she felt threatened by Ms. Mosley's presence.  (SOF ¶ 75; Pl. Decl. ¶ 53; Pl. Dep. Ex. D; Groulx Decl. ¶ 17 & Groulx Ex. B; Dawson Decl. ¶ 9.)

In her January 26, 2018 email, Plaintiff made a number of other complaints and accusations, including that her supervisors were watching her work too closely.  (Pl. Dep. 272:19-276:25 & Pl. Dep. Ex. E.)  Plaintiff also claimed that she did not feel safe at work and that Nike had "felons" hired by Manpower and "gang members working inside." (Pl. Dep. Ex. D.)

15

In her January 26, 2018 email, Plaintiff also alleged for the first time that earlier in the week she had gone home in tears after listening for an hour to "a man . . . talking to another girl and man about his dates and sex in a very disrespectful way." (Pl. Dep. Ex. D at 2.) Plaintiff did not identify the male or female coworkers by name in the email. Plaintiff admits that the male coworker did not direct the comments towards her. (Pl. WC Dep. 72-73.)

Mr. Benton was assigned to investigate Plaintiff's allegations raised in her January 26, 2018 email. (Groulx Decl. ¶¶ 19-23; Pl. Dep. 249:2-252:10.) On Monday, January 29, 2018, Plaintiff reported to work for her next regularly scheduled shift. (Dawson Decl. ¶ 12.) On Monday, January 29, 2018, Mr. Benton spoke with Plaintiff by telephone to get further information regarding the concerns raised in her January 26, 2018, email. (SOF ¶ 80; Groulx Decl. ¶19; Pl. Dep. 249:21-252:10.) After initially testifying that she did not believe Mr. Benton called her, Plaintiff said, "Okay. Yeah. So Patrick–okay. Yeah. So the sex–yes. So Patrick did call because he was the one that –that wanted the name of the person." (Pl. Dep. 251:9-10.) During that call, Mr. Benton asked Plaintiff the name of the man who discussed sex and to explain the comments the man made. Plaintiff identified the male coworker but would only reveal that he spoke graphically about sex. (SOF ¶ 81; Groulx Decl. ¶ 20.) [8]

On Thursday, February 1, 2018, before Nike Employee Relations' investigation of her complaint was complete, Plaintiff reported to work. A male coworker named Eric Smith walked

---

[8]Plaintiff's Declaration states: "As of February 1, 2018, I had not received a response to the corporate complaint I made on January 26, 2018." (Pl. Decl. ¶ 54.) Nike objects that this statement should be disregarded as contradicted by Plaintiff's admission of Statement of Fact 80 that Nike ER investigator Patrick Benton spoke to her by telephone on January 29, 2018, to get more information. The Court agrees that paragraph 54 of Plaintiff's Declaration contradicts her admission to SOF 80 and her deposition testimony if it is understood to imply that Plaintiff declares she was not contacted by anyone from Nike ER before February 1, 2018. But this is not what paragraph 54 says. The Court interprets paragraph 54 of Plaintiff's Declaration as stating that Nike had not provided Plaintiff with an official response to her January 26, 2018 complaint by February 1, 2018. This is undisputed.

by Plaintiff and said, "It's morning and I'm hard."  (Pl. Dep. 195:20-196:10.)  Plaintiff believes Smith's comment that he was "hard" was said so she could hear it, but Plaintiff was not looking at Smith because she was looking down at her work and does not know if Smith was looking at her. (Pl. Dep. 195:11-197:6.)

A female coworker was sitting nearby when Smith made the comment, and Smith sat down to talk with that coworker and had a conversation with her about sexual matters ("it was sexual in content, about sex and this and that") in a normal tone of voice for ten to fifteen minutes.  (Pl. Dep. 196:22-202:24.)  This conversation was not directed toward Plaintiff and did not involve her but she could hear it.  (Pl. Dep. 195:20-202:24; Pl. WC Dep. 72-73.)  Smith was also the person who had the first conversation about sex that Plaintiff complained about in her January 26, 2018 email. (Pl. Dep. 274:7-17; 276:10-18; Pl. WC Dep. 72-73.)  These two incidents were the only ones Plaintiff had with Eric Smith.  (Pl. WC Dep. 73.)

Later on the morning of February 1, 2018, another employee began playing uncensored music near Plaintiff.  (Pl. Decl. ¶ 58.)  Plaintiff "did not feel safe so [she] decided to leave."  (Pl. Decl. ¶ 59.)  Before leaving, Plaintiff went to Ms. Lindsey's HR office.  Plaintiff admits that Ms. Lindsey tried to speak to her about the matters set forth in the January 26, 2018 email, but Plaintiff testified she did not want to talk to Ms. Lindsey because she "was done" with the situation and, "I really wasn't interested in talking to her."  (Pl. Dep. 252:15-25.)

Even so, during Plaintiff's conversation with Ms. Lindsey on February 1, 2018, Plaintiff told Ms. Lindsey about a former temporary worker who was employed by Manpower but assigned to work at Nike back when Plaintiff was on the Zoom C shift.  (Pl. Dep. 277:12.)  Plaintiff identifies this worker as "Armed" but does not know his last name.  Plaintiff testified that Armed engaged her in a political conversation about a protest he attended about President Donald Trump.  After it came out that Plaintiff had voted for Donald Trump, Plaintiff says Armed told her that she must

be racist for voting for President Trump.  (Pl. Dep. 215:11-25; 284:10-13; 298:12-300:1; 314:17-18.)  Armed and Plaintiff then voluntarily went to lunch together in the Nike cafeteria and had a discussion during which Armed spoke of Black oppression, which Plaintiff described as a "learning experience in a sense" for her.  (Pl. Dep. 284:10-18; 286:16-288:13.)  Plaintiff also said that Armed spoke of oppression and Black history to everyone that would listen (Pl. Dep. 286:5-10), including everyone on the C shift.  (Pl. Dep. 294:23-297:1.)

When Plaintiff reported Armed's comments to Nike Human Resources on February 1, 2018, Armed was no longer working with Plaintiff.  (Olivia Lindsey Dep. 50:4-56:15, ECF No. 34-11.  Plaintiff testified she had previously told Mr. Politte that Armed told her she was racist because she voted for President Trump (Pl. Dep. 277:4-279:9).

After meeting with Ms. Lindsey, Plaintiff left the facility without completing her shift.  (Pl. Dep. 300:18-21.)  Plaintiff applied for and was approved by Nike to take a leave of absence that commenced on February 2, 2018.  (Dawson Decl. ¶ 14; Pl. Dep. 269:14-25.)  Plaintiff applied for workers' compensation benefits, claiming the "hostile work environment" to which she had been subjected caused her emotional injury.  (Pl. WC Dep. 38.)

Plaintiff never returned to work at Nike after February 1, 2018.  (Pl. Dep. 269:14-25.)  Plaintiff resigned her position with Nike via email on August 13, 2018.  (Pl. Dep. 304:5-18 & Pl. Dep. Ex. G.)  At some point after February 1, 2018, Nike banned radios at its St. Charles facility.  (Mosley Dep. 18:11-19.)

E. *Nike Investigates Plaintiff's January 26, 2018 Complaints*

On February 2 and 6, 2018, Mr. Benton attempted to call Plaintiff regarding her January 26, 2018 complaint, but she did not answer so he left voicemail messages asking Plaintiff to call him.  (Groulx. Decl. ¶ 21.)  Mr. Benton did not receive a return call from Plaintiff.  (Id.)  Mr. Benton, in partnership with Plaintiff's supervisor Carey Godi, investigated Plaintiff's complaints,

including interviewing the male coworker, Eric Smith, and the other worker in his cell.[9]  (Groulx.

Decl. ¶ 22.)

Mr. Benson investigated Plaintiff's complaints and concluded that Ms. Mosley had not

attempted to engage in any interaction with Plaintiff, and that there was no evidence to indicate

Plaintiff's supervisor was "spying" on her.  (Groulx Decl. ¶ 23.)  Nike's investigation also found

no evidence to substantiate Plaintiff's allegations about the inappropriate sexual conversation by

Smith, the male coworker.  (Groulx Decl. ¶ 24.)

III.  Other Allegedly Harassing or Retaliatory Actions

Plaintiff testified that she overheard Black coworkers use the "n" word when speaking to

each other, but she never complained to her supervisor that her coworkers had those conversations.

(Pl. Dep. 82:18-22-83:2; Politte Decl. ¶ 7.)

Plaintiff testified that while she worked on the A shift, a coworker named Michelle Pepper

(white, female) who was in charge of a cell "picked on [her] all the time," for example by

criticizing Plaintiff for throwing away bad parts instead of bagging them up, telling the Lead about

it, and making Plaintiff initial the parts. (Pl. Dep. 181:24-182: 20, 184:17-186:1.)

Plaintiff testified that three coworkers laughed at her when she was corrected by the cell

operator for making a mistake when cleaning a machine.  (Pl. Dep. 204:1-206:15.)

Plaintiff testified her coworkers "isolated and targeted [her]" in that nobody talked to her.

(Pl. Dep. 208:8-14.)  Plaintiff testified that while she "couldn't prove it," she thinks she was

isolated and targeted because she believes Ms. Mosley had friends on the A Shift and because,

according to co-worker Bob Parsons (white, male), she was "marked as a racist."  (Pl. Dep. 52:10-

---

[9]A manufacturing cell is a set of machines grouped by the products or parts they produce. Investopedia, Manufacturing Cells, https://www.investopedia.com/terms/m/manufacturing-cells.asp (last visited Apr. 26, 2021).

12; 208:11-210:3; 211:21-22; 214:18-24; 215:11-216:2.)  Plaintiff also testified she heard second-hand that a Black coworker she liked and got along with named Jesse said other employees "marked [her] as a racist," but Plaintiff does not know if that is because Armed told other employees she voted for Trump or if "it was just what [Jesse] heard from others."  (Pl. Dep. 213:4-214:24; 215:11-25; 284:10-13; 298:12-300:1; 314:17-18.)

Plaintiff testified she "got along with everybody . . . in her work group" but said "it seemed like there was a point where I was feeling alienated by the people that did talk to me" and her coworkers "seemed more distant."  (Pl. Dep. 297:4-298:2.)  Plaintiff testified that the fact her coworkers seemed more distant or weren't talking to her did not impact her ability to do her job. (Id. 298:7-11.)

**Discussion**

A.  Racial Harassment Claim Based on Hostile Work Environment

In Count I, Plaintiff asserts that she was subjected to a hostile work environment based on her race, in violation of Title VII.  Plaintiff has the initial burden of establishing a prima facie case of a racially hostile work environment.  To prevail on a hostile work environment claim based on co-worker harassment, a plaintiff must prove that (1) she was a member of a protected group; (2) she was subjected to unwelcome race-based harassment; (3) the harassment was because of membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take appropriate action.  Banks v. Deere, 829 F.3d 661, 667 (8th Cir. 2016); see also Vance v. Ball State Univ., 570 U.S. 421, 424 (2013) ("If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.").

"Eighth Circuit precedent sets a high bar for conduct to be sufficiently severe or pervasive in order to trigger a Title VII violation."  Paskert v. Kemna-ASA Auto Plaza, Inc., 950 F.3d 535,

538 (8th Cir. 2020). "The standard for demonstrating a hostile work environment under Title VII is 'demanding,' and 'does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace.'" Liles v. C.S. McCrossan, Inc., 851 F.3d 810, 823 (8th Cir. 2017) (quoted cases omitted). "[C]onduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment." Blomker v. Jewell, 831 F.3d 1051, 1057 (8th Cir. 2016) (quoted case omitted).

"When evaluating a hostile environment, [courts] look at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." Id. (cleaned up) (quoted case omitted). "More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." Id. (internal punctuation and quoted case omitted). Nonetheless, "In deciding whether there was an objectively hostile work environment, the evidence must be examined as a whole. A hostile work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents." Ellis v. Houston, 742 F.3d 307, 319 (8th Cir. 2014) (cleaned up; quoted case omitted).

Viewing the facts in the light most favorable to Plaintiff and drawing all justifiable inferences in her favor, the Court finds as a matter of law that Plaintiff fails to show the conduct she complains of was based on her race, and fails to show it was severe or pervasive enough to satisfy the high threshold for a racial harassment claim based on hostile work environment. In addition, Plaintiff fails to establish that Nike knew or should have known of the racial harassment and failed to take appropriate action.

### 1. *Plaintiff Does not Establish the Conduct was Based on Race*

For harassing conduct to constitute race discrimination, it must be determined that the alleged harassing actions were taken based on the plaintiff's race. See Singletary v. Missouri Dep't of Corr., 423 F.3d 886, 892 (8th Cir. 2005). "[O]nly incidents that 'have a racial character or purpose' can support [Plaintiff's] claim." Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1083 (8th Cir. 2010), abrogated on other grounds by Torgerson, 643 F.3d 1031. Plaintiff's main assertion is that her coworkers created a racially hostile work environment by playing loud, "uncensored" rap music at work, which eventually led to a physical altercation with a coworker. Plaintiff also complains that she was called a racist by a temporary worker, based on her support of Donald Trump. While it is evident Plaintiff found her work environment unpleasant, there is no evidence any of the matters she complains of were based on her race.

Plaintiff testified that rap music is "African-American, you know, type of music," and characterized the music she heard as "very aggressive," including profanity and "the 'N'" word, and "talking about gangs," "talking about police," "things about white people," "shootings and guns," and "black gangs and white people and shoot the police." (Pl. Dep. 40:11-21; 61:17-22; 113-115.) Plaintiff states in her post-deposition Declaration that she heard the word "cracker" in songs daily and on at least ten occasions heard songs that "promoted violence against white police officers and white people in general." Pl. Decl. ¶ 13.

While Plaintiff was offended by the content and language of the rap music played or listened to by her coworkers of various races and genders, including white coworkers, Plaintiff admits her coworkers did not play rap music because of her white race. Accepting that some portion of the music contained lyrics negatively related to white people, including daily use of the word "cracker;" and white police, and violence toward white police, Plaintiff offers no evidence the rap music was *directed to her* or played *because of her race*. Plaintiff's racial harassment

claim relating to rap music is also undercut by her admissions that some of her white coworkers enjoyed the music being played, and that "everyone" including "white young kids" listens to rap music. Thus, Plaintiff admits rap music as a genre cannot be categorized as exclusively by, for, affiliated with, or directed at one race. In addition, Plaintiff's supervisors, managers, and human resources manager were all white.

To be actionable under Title VII, the conduct Plaintiff complains of must be tied directly or indirectly to her race. As stated above, Title VII "is not a general civility code for the American workplace." Liles, 851 F.3d at 823. Without some evidence that the rap music played by Plaintiff's coworkers was played because of Plaintiff's white race, this is a race-neutral allegation that cannot form the basis of a racial harassment claim under the facts of this case. See Abraham v. Heroes' Sports Bar, LLC, 2008 WL 11445448, *9 (D. Kan. Feb. 26, 2008) (granting summary judgment on racial harassment claim because neither the "gangsta rap" music played in the workplace nor a Black coworker's words (use of the term "my 'n'") were directed at the Black plaintiff, though he was offended by them); Rayburn-Duitman v. South Bend Tribune Corp., 2000 WL 552539, at *4 (N.D. Ind. Jan. 20, 2000) (granting summary judgment on white plaintiff's hostile work environment claim as not pervasive or severe enough where three Black coworkers played rap music, called plaintiff a "white bitch" on one occasion, bumped her on one occasion, and told her to "sit down and shut up."); cf. Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906, 910 (8th Cir. 2003) (concluding graffiti associated directly with the plaintiff's name such as "coon," "all n*****s must die," and "kill all n******s," the last of which was not removed after notice to the employer, was sufficient to survive summary judgment on a racial hostile work environment claim); Peterson v. City of Rochester, 2010 WL 1408013, at *7 (W.D.N.Y. Mar. 31, 2010) (denying summary judgment on sex and racial harassment claims where plaintiff was the only Black woman in her department and "presented proof of several overtly hostile acts arguably

related to race and gender animus such as co-workers repeatedly playing lewd and racially loaded rap music outside her office door, and leaving a sexually crude and offensive 'Pre–Booty Call Agreement' on her office chair.").

To the extent Plaintiff's racial harassment claim is based on her physical altercation with Black coworker Nikisha Mosley, there is no evidence the incident was race-based as opposed to a personal disagreement.  Plaintiff testified she had not worked with Ms. Mosley before and had never spoken to her previously.  It is uncontroverted the dispute occurred after Plaintiff told Ms. Mosley she did not like and did not want to listen to the loud, explicit rap music Ms. Mosley was playing on a radio.  Plaintiff then attempted to unplug the radio, and Ms. Mosley physically stopped her by forcefully grabbing Plaintiff's arm and waist.  Plaintiff presents no evidence that Ms. Mosley was playing the music because of Plaintiff's race, but testified she believes this was so because Plaintiff believed Ms. Mosley knew that Plaintiff was the person who complained about music earlier.  Plaintiff's belief that Ms. Mosley played the rap music to annoy her is mere speculation.  This is insufficient to raise an issue of material fact.  See Carter, 956 F.3d at 1059.

Plaintiff also presents no evidence to link Ms. Mosley's action of grabbing her arm and waist to Plaintiff's race.  While Ms. Mosley's action was inappropriate workplace conduct, Plaintiff does not support her allegation that it was race-based with sufficient probative evidence to provide a nexus between the action and Plaintiff's race.  Plaintiff must present evidence that harassment was race-based to survive summary judgment.  See Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 566-67 (8th Cir. 2000) (allegations by white female employee that coworkers and supervisors ignored her, isolated her from office social activities, and a Black female coworker "damaged her car, shoved her against a wall, and threatened her with bodily harm" were insufficiently severe or pervasive enough to prove hostile work environment claim under Title VII, and absent anything more than plaintiff's "bare allegations that her co-workers

harassed her because of her race or gender."); <u>Bradley v. Widnall</u>, 232 F.3d 626, 632 (8th Cir. 2000) (summary judgment was proper on hostile work environment claim where plaintiff was unable to provide any evidence of a nexus between the alleged harassment and her protected status), <u>abrogated on other grounds by</u> <u>Torgerson</u>, 643 F.3d 1031; <u>Johnson v. SuperValu, Inc.</u>, 2018 WL 5393665, at *3 (E.D. Mo. Oct. 29, 2018) (dismissing Title VII retaliation claim for lack of protected conduct where Black female plaintiff reported that white male employee hit her in the head with a frozen water bottle but did not allege that he did so because of her sex or race); <u>cf.</u> <u>Bowen v. Mo. Dep't of Social Servs.</u>, 311 F.3d 878, 884 (8th Cir. 2002) (8th Circuit found white plaintiff established coworker's harassment was based on race and created a hostile work environment sufficient to survive summary judgment where Black former supervisor said to plaintiff, "You kiss my ass, you white bitch!" and later called plaintiff a "menopausal white bitch" then immediately threatened plaintiff with physical harm and ran toward her, chasing plaintiff back to her cubicle; this conduct including the physical threat had a nexus to overt racism); and <u>Diaz v. Swift-Eckrich, Inc.</u>, 318 F.3d 796, 800 (8th Cir. 2003) (8th Circuit reversed summary judgment for defendant where white coworker repeatedly demeaned and made offensive references to Hispanics and to plaintiff specifically; this was sufficient for a factfinder to find the harassment was based on national origin, and the offensive references to Hispanics could support a finding that the white coworker hit plaintiff twice as part of the same pattern of harassment).

Plaintiff's evidence also does not establish that the conduct of the temporary coworker who called Plaintiff a racist because she voted for President Trump relates to Plaintiff's race or was based on animus to her race. Plaintiff alleges that he called her a racist because of who she voted for, not because she is white.[10] This is a substantive distinction. <u>See</u> <u>Dodge v. Wynne</u>, 2006 WL

---

[10]Political affiliation is not protected by Title VII. 42 U.S.C. § 2000e(2)(a).

2037575 at *2 (D. Utah July 18, 2006) ("Plaintiff has not demonstrated that he was called a racist because he is Caucasian.  Rather, Plaintiff was called a racist because the co-worker interpreted Plaintiff's conduct *toward him* as rooted in racial bias."); Hughes v. Goodwill Indus. of Ark., Inc., 2015 WL 4776787, at *4 (E.D. Ark. Aug. 4, 2015) (plaintiff was called a "prejudiced white prick" by a Black coworker; court found the evidence established the coworker called plaintiff that because she had heard the plaintiff "made racially prejudiced remarks[,] not because of racial animus.").

Plaintiff's allegations that other coworkers did not talk to her, that three coworkers laughed at her on one occasion because she made a mistake, and that a white female cell operator picked on her and criticized her for throwing away parts, are not actionable.  Plaintiff does not offer any evidence, as opposed to speculation, that this conduct was based on her race.  Moreover, this kind of conduct by coworkers falls within the category of "petty slights or minor annoyances that often take place at work and that all employees experience."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

### 2. *The Conduct Plaintiff Complains of Was Not Sufficiently Severe or Pervasive*

Plaintiff was exposed to the rap music three days per week for part, but not all, of the three-month period she worked on Zoom C shift between late August 2017 and November 26, 2017. Plaintiff heard the word "cracker" daily and lyrics concerning violence against white people or white police officers on at least ten occasions.  To prevail, Plaintiff must prove the conduct was "both subjectively and objectively offensive" and "extreme in nature and not merely rude or unpleasant."  Liles, 851 F.3d at 823.  Eighth Circuit cases have required much more severe and pervasive conduct than Plaintiff alleges here to establish a racially hostile work environment.  See, e.g., Palesch, 233 F.3d at 566-67 (allegations by white female employee that coworkers and supervisors ignored her, isolated her from office social activities, and a Black female coworker

26

"damaged her car, shoved her against a wall, and threatened her with bodily harm" were insufficiently severe or pervasive enough to prove hostile work environment claim); Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611, 618 (8th Cir. 2007) (coworker's antagonistic and racial comments and "childish pranks" such as misloading plaintiff's trailer and putting trash in his trailer weekly over a four-year period did not rise to the level of an objectively hostile work environment); cf. Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d 349, 356 (8th Cir. 1997) (Black plaintiff established a racially hostile work environment where he was called "some of the most offensive of racist epithets," and racist names and racial comments were used in his presence and directed to him on a regular basis throughout his two-year employment);.

While the one-time physical incident with Ms. Mosley was subjectively very upsetting for Plaintiff, it was not objectively severe enough to rise to the level of actionable harassment.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81 (1998) (Title VII "does not prohibit all verbal or physical harassment"); Palesch, 233 F.3d at 566 (allegations by white female employee that Black female coworker "damaged her car, shoved her against a wall, and threatened her with bodily harm" were insufficiently severe or pervasive enough to prove hostile work environment claim under Title VII).

Further, that Plaintiff was called a racist by a temporary coworker on one occasion does not rise to the level of severe and pervasive harassment.  Cf. Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759-60 (8th Cir. 2004) (concluding racial slurs that were "sporadic, no more than one per month," over a period of two years, some of which were "merely overheard" by the employee, were not so severe or pervasive to alter the terms or conditions of his employment); Singletary, 423 F.3d at 893 ("We have held that racial slurs alone do not render a work environment hostile as a matter of law;" holding where Black plaintiff learned second-hand that coworkers and supervisors had referred to him as a "n" several times was insufficient to support a

27

hostile work environment claim.)   This is particularly true where Plaintiff admitted the man immediately apologized to her for saying that she was a racist, and Plaintiff voluntarily continued the conversation with him over lunch.

### 3. *Conduct Considered in Accumulation*

The Court has discussed separately the multiple facets that comprise Plaintiff's claim of hostile environment based on her race, but it expressly considers these in accumulation in determining whether Plaintiff was subjected to a racially hostile work environment.   Ellis, 742 F.3d at 319.   The Court concludes that Plaintiff's exposure to her coworkers' rap music containing lyrics subjectively offensive to her, including occasional references to violence against white people and white police, Plaintiff's physical altercation with coworker Nikisha Mosley arising out of Mosley's playing rap music, and Plaintiff being called a racist by a coworker, considered as a whole, are not actionable because (1) there is insufficient evidence to establish that any of the coworkers' conduct was based on Plaintiff's race, and (2) the conduct considered as a whole was not so severe and pervasive as to alter Plaintiff's conditions of employment and rise to the level of a hostile work environment.   For these reasons, Nike is entitled to summary judgment on this claim.

### 4. *Plaintiff Fails to Establish Nike's Negligence*

Even if Plaintiff had established the other elements of her prima facie case, she does not raise a triable issue of fact as to the fifth element, that Nike knew or should have known of the racial harassment directed against her and failed to take corrective action.   Because Plaintiff alleges harassment by coworkers and not supervisors, Nike can be held liable only if it was negligent in controlling the working conditions.   Vance, 133 S. Ct. at 2439.

As a threshold matter, when Plaintiff complained about the workplace music to Nike HR and Employee Relations, her written contemporaneous complaints never mentioned specific lyrics,

28

described it as racially offensive or hostile, or tied her concerns to her race in any way.  Instead, she complained about the volume and that it was "uncensored."  Plaintiff's initial complaint in September 2017 to her supervisor, Mr. Politte, was that the music was "just too loud and the content of the music."  Pl. Dep. 61:14-18.  When asked what she said to Mr. Politte about the content, Plaintiff testified, "The words.  . . . the "N," the "F," the "MF."  (Id. 61-19:22.)  When asked if there was anything else she said to Mr. Politte during her first complaint Plaintiff testified, "No.  I mean, other than, you know, what was being played and how loud it was." (Pl. Dep. 65:14-20.)  Plaintiff also never reported to Nike that she believed the incident with coworker Ms. Mosley was racially motivated.

Even if Plaintiff had complained to Nike about specific lyrics in the music negatively referring to white people, white police, and violence against white police, Nike took prompt remedial action to address Plaintiff's concerns.

Plaintiff's supervisor Mr. Politte addressed her complaint by calling a meeting for Plaintiff's entire shift the next day and reminding the workers of the terms of Nike's electronic device policy, which sets out guidelines for listening to music on the floor, and when he walked the floor directed employees playing music in violation of the policy to turn it off.  Plaintiff admits that for the two weeks after the meeting, there was no loud, offensive music played.  Plaintiff also admits that when supervisors walked the floor the music was turned down, and she could not hear the music when she worked in certain positions where she was by herself, so she didn't complaint on those days because it didn't bother her.  (Pl. Dep. 70:1-11.)

Plaintiff contends she was left on her own because Mr. Politte subsequently told her to deal with the music issue herself.  It is undisputed Nike had a comprehensive anti-harassment policy with a procedure for reporting alleged harassment, and it disseminated information about the policy and procedure to employees.  Plaintiff was aware of the policy and accompanying complaint

procedures.  Plaintiff sent an email complaint about the music to the on-site HR Manager, Ms. Lindsey, on November 17, 2017.  It is undisputed that Ms. Lindsey was out of the office from November 17, 2017, until November 27, 2017.[11]  Before Ms. Lindsey returned to work and could address Plaintiff's complaint, the incident between Plaintiff and Ms. Mosley occurred concerning the radio.  The supervisors promptly addressed that situation by immediately interviewing Plaintiff and Ms. Mosley, as well as the witness.   Ms. Mosley apologized to Plaintiff during the investigation and Nike issued a written corrective action to Ms. Mosley for her conduct during the dispute.

Plaintiff sent an email complaint about the incident with Ms. Mosley to Nike Employee Relations and Mr. Benton on November 27, 2017, asking to be moved to a different shift and that Ms. Mosley be fired.  Nike contacted Plaintiff on November 30, 2017 and offered her immediate transfer to the evening shift, which Plaintiff declined.   Nike continued to investigate and then offered Plaintiff her requested relief of moving to A shift on December 3, 2017, six days after Plaintiff lodged her complaint.  This is a reasonable time to investigate a complaint and formulate a remedy, which included Plaintiff's requested remedy of moving to A shift.  Cf. Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 419, 421 (8th Cir. 2010) (twenty-one days was a reasonable time for employer to investigate complaint and formulate a remedy).   The fact that Plaintiff desired an additional harsher response, that Ms. Mosley be fired, does not make Nike's response ineffective.  See Crawford v. BNSF Ry. Co., 665 F.3d 978, 984 (8th Cir. 2012).  "Federal courts . . . are not in the business of micromanaging or second-guessing companies' internal investigations" and "must afford an appropriate degree of deference to business judgment" where

---

[11]The Court takes judicial notice this period included the Thanksgiving holiday in 2017.

the record shows that the employer conducted a reasonable investigation in good faith.  Adams v. O'Reilly Automotive, Inc., 538 F.3d 926, 930 (8th Cir. 2008) (citing cases).

Finally, Nike investigated Plaintiff's final email complaint of January 26, 2018 by having investigator Mr. Benton contact her by phone on January 29, 2018, but Plaintiff did not return the investigator's subsequent calls about the complaint and never returned to work after February 1, 2018.  The record indicates Nike took reasonable steps to address Plaintiff's complaints and cannot be held liable as a matter of law.  Nike is entitled to judgment on this claim.

B.  Sexual Harassment Claim Based on Hostile Work Environment

In Count II, Plaintiff asserts that she was subjected to a hostile work environment based on her sex, in violation of Title VII.  Plaintiff has the initial burden of establishing a prima facie case of a sexually hostile work environment.  To recover on a claim for a hostile work environment based on co-worker harassment, Plaintiff must show that: "(1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action."  Lopez v. Whirlpool Corp., 989 F.3d 656, 662-63 (8th Cir. 2021) (quoting Blomker, 831 F.3d at 1056), and citing Vance, 570 U.S. at 424 ("If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.").

"Eighth Circuit precedent sets a high bar for conduct to be sufficiently severe or pervasive in order to trigger a Title VII violation."  Paskert, 950 F.3d at 538.  "The standard for demonstrating a hostile work environment under Title VII is 'demanding,' and 'does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace.'"  Liles, 851 F.3d at  823 (quoted cases omitted).  "[C]onduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment."  Blomker, 831 F.3d at 1057 (quoted

case omitted).  "More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment."  Id. (internal punctuation and quoted case omitted).

### 1. *Plaintiff Fails to Establish the Conduct was Based on Sex*

Viewing the facts in the light most favorable to Plaintiff and drawing all justifiable inferences in her favor, the Court finds as a matter of law that Plaintiff fails to show the conduct she complains of was based on sex, or was severe or pervasive enough to satisfy the high threshold for a sexual harassment claim based on hostile work environment.  In addition, Plaintiff fails to establish that Nike knew or should have known of the alleged sexual harassment and failed to take appropriate action.

Plaintiff's sexual harassment hostile environment claim is based on (1) hearing rap music that contained sexually explicit lyrics while she was working on the Zoom C shift, (2) hearing a male coworker talk for an hour "about his dates and sex in a very disrespectful way" in a conversation with two other coworkers that was not directed to and did not involve Plaintiff, (3) a week later, hearing the same male coworker state, "I am hard," and believing the statement was directed to her although she cannot say for sure because she was not looking at the coworker and does not know if he was looking at her, and (4) immediately thereafter hearing a conversation between that male coworker and a female coworker related to sex and sexual matters that took place in a normal tone of voice and lasted fifteen minutes, and was not about Plaintiff or directed to her.

The third element of the prima facie case, that the unwelcome harassment be based on sex, "forces a plaintiff to prove that she was the target of harassment because of her sex and that the offensive behavior was not merely non-actionable, vulgar behavior.  This distinction exists because 'Title VII does not prohibit all verbal or physical harassment in the workplace' and is not

'a general civility code for the American workplace.'" <u>Pedroza v. Cintas Corp. No. 2</u>, 397 F.3d 1063, 1068 (8th Cir. 2005) (quoting <u>Oncale</u>, 523 U.S. at 80). "Consequently, to succeed on a hostile work environment claim under Title VII, a plaintiff must show 'that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex.'" <u>Oncale</u>, 523 U.S. at 81 (quoting 42 U.S.C. § 2000e–2(a)(1)). Here, Plaintiff offers no evidence that sexually offensive music lyrics or the coworker's comments she complains of were discriminatory or were based on her sex, as opposed to being non-actionable, vulgar behavior with sexual connotations that she found offensive. Plaintiff's sexual harassment claim fails because she does not establish a triable issue of fact on the third element of her case.

### 2, *Plaintiff Fails to Establish the Conduct was Severe or Pervasive*

Even if Plaintiff had established a triable issue of fact on the third element, she fails to establish a triable issue of fact on the fourth element, that the alleged sexual harassment affected a term, condition, or privilege of her employment. The Eighth Circuit recently reiterated that "to raise a triable fact on the fourth element, the claim-triggering conduct must be severe or pervasive enough to create an objectively hostile or abusive work environment." <u>Lopez</u>, 989 F.3d at 663 (citing <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21-22 (1993)). "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." <u>Id.</u> (quoting <u>Harris</u>, 510 U.S. at 23). "Those circumstances 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" <u>Id.</u> (quoting <u>Harris</u>, 510 U.S at 23.) The Eighth Circuit has "often noted that [its] precedent 'sets a high bar' for 'sufficiently severe or pervasive' conduct." <u>Id.</u>; <u>see</u>, <u>e.g.</u>, <u>Duncan v. General Motors Corp.</u>, 300 F.3d 928, 934-35 (8th Cir. 2002) (male supervisor's harassing behavior was not sufficiently severe and pervasive so as to subject the female plaintiff to a hostile working

environment where he  requested a sexual relationship from the plaintiff; touched her hand on several occasions; asked her to draw a picture of his planter that depicted a hole in the front of a man's pants from which a cactus protruded; displayed a pacifier shaped like a penis and a computer screen with a picture of a naked woman; displayed a poster depicting plaintiff as the "President and CEO of the Man Hater's Club of America" together with a statement that plaintiff must also be in control of sex; and asked plaintiff to draft the beliefs of the "He-Men Women Hater's Club.").

The Court concludes the sexually explicit lyrics in the rap music Plaintiff was exposed to during a three-month period of her employment and the three isolated incidents involving lewd and/or sexually offensive utterances that Plaintiff complains of are nowhere near sufficiently severe or pervasive enough to alter the conditions of Plaintiff's employment and meet the rigorous standard for establishing an objectively hostile work environment in the Eighth Circuit.  Numerous Eighth Circuit decisions have held that comparable or more egregious conduct does not rise to the level of an actionable hostile work environment.  See, e.g., Lopez, 989 F.3d at 663 (male coworker's conduct in repeatedly touching female employee on her shoulder, arm, or back, even after employee and employee's supervisor had asked coworker to stop touching her, invading her personal space, calling her "baby," and glaring at employee for long periods was insufficiently severe and pervasive enough to create an objectively hostile or abusive work environment); E.E.O.C. v. CRST Van Expedited, Inc., 679 F.3d 657, 687 (8th Cir. 2012) (coworkers' boasting about past sexual exploits and sporadic remarks of sexual vulgarity were "mere offensive utterances," noting the Eighth Circuit has cautioned that "sporadic or casual comments are unlikely to support a hostile environment claim;" these facts together with highly offensive but isolated instances of coworkers propositioning the plaintiffs for sex were insufficiently severe or pervasive to alter the conditions of plaintiffs' employment); Alvarez, 626 F.3d at 420 (allegations that coworker made sexually inappropriate comments including about the plaintiff's breasts on several

occasions, and told plaintiff he was fixing a table so she could "strip dance on it" were not actionable harassment); <u>Vajdl v. Mesabi Acad. of KidsPeace, Inc.</u>, 484 F.3d 546, 551-52 (8th Cir. 2007) (repeated comments about plaintiff's body by two coworkers, repeated requests for dates by two coworkers, and two incidents of touching of plaintiff's hair and pant leg by a coworker did not amount to severe or pervasive conduct which altered a term, condition, or privilege of plaintiff's employment); and <u>Davison v. City of Lone Jack, Mo.</u>, 121 F. App'x 671, 672 (8th Cir. 2005) (unpublished per curiam) (plaintiff failed to establish sexually hostile work environment where she daily overheard police officers make offensive and vulgar statements about women, none of which were directed at her.  While the statements were lewd and offensive, they were not sufficiently severe or pervasive to alter the conditions of plaintiff's employment; "mere offensive utterances" do not create a hostile work environment).  Accordingly, Nike is entitled to summary judgment on this claim.

### 3.   *Plaintiff Fails to Establish that Nike Knew or Should Have Known of the Harassment and Failed to Take Prompt Remedial Action*

Finally, even if Plaintiff had established fact issues as to the first four elements of the prima facie case, she fails to raise an issue of triable fact as to the fifth element, that Nike knew or should have known of the sexual harassment and failed to take proper remedial action.  The evidence on summary judgment is that Plaintiff failed to report the male coworker's comments to Nike.  At deposition, Plaintiff testified that her male coworker said, "I'm hard," and had discussed his sexual activity with other coworkers on two occasions in her hearing.  But when she made a written complaint about this to Nike, Plaintiff stated only that the coworker made "graphic sexual comments" and refused to provide more detail.  Nonetheless, when Plaintiff complained about the incidents with the male coworker, Nike promptly initiated an investigation, which included contacting Plaintiff for information, attempting to contact her twice again, and interviewing the

participants in the alleged conversations but was unable to corroborate Plaintiff's report.  (SOF ¶¶ 93-96.)

Plaintiff also did not report the music to Nike as sexually hostile.  Plaintiff admitted at deposition that she did not report any sexual music content to her supervisor, Mr. Politte.  Her written complaints to Nike never mentioned specific sexually offensive lyrics, described the music as sexually offensive or hostile, or tied her concerns to sex in any way.  As stated above, the Court finds that Plaintiff's post-deposition Declaration does not establish an issue of fact as to whether she reported any sexually offensive music lyrics to Nike.  Based on these facts, Lehr cannot establish that Nike could be liable for the alleged conduct.  Nike is entitled to judgment on this claim.

C.  Retaliatory Harassment Based on Hostile Work Environment Claim

In Count III, Plaintiff asserts that she was subjected to a hostile work environment based on retaliation, in violation of Title VII.  In her summary judgment opposition, Plaintiff identifies the specific conduct she alleges created a hostile work environment based on retaliation as "the assault [by coworker Ms. Mosley] occurring on November 26, 2017, and the incident whereby Mosley presented to A shift occurring on January 25, 2018."  (ECF No. 44 at 13.)

Title VII prohibits employers from retaliating against employees from engaging in activity that is protected under the statute.  42 U.S.C. §§ 2000e-3(a) and 2000e-16(a).  A claim of retaliation pursuant to Title VII is not based upon discrimination, "but instead upon an employer's actions taken to punish an employee who makes a claim of discrimination."  Haas v. Kelly Servs., Inc., 409 F.3d 1030, 1036 (8th Cir. 2005), abrogated in part on other grounds by Torgerson, 643 F.3d 1031. Plaintiff "first must demonstrate a prima facie case of retaliation to survive summary judgment."  Jackson v. United Parcel Service, Inc., 643 F.3d 1081, 1088 (8th Cir. 2011) (quoted case omitted).  To meet this initial burden, Plaintiff must show that "(1) she engaged in statutorily

protected conduct; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two." Lopez, 989 F.3d at 664 (quoting DePriest v. Milligan, 823 F.3d 1179, 1187 (8th Cir. 2016)).  Nike asserts it is entitled to summary judgment because Plaintiff has not shown evidence to establish any element of her prima facie case.

### 1. *Plaintiff Did Not Engage in Statutorily Protected Conduct*

Nike asserts that Plaintiff's complaints about rap music are not protected activity because they did not relate to her race or sex.  Nike states that Plaintiff admits she did not intend to complain about racial or sexual harassment when she complained about the music, and her contemporaneous email complaints to Nike's HR and Employee Relations about the music did not allege harassment or discrimination based on her race or sex.  Nike also asserts that Plaintiff's altercation with her coworker Ms. Mosley was about the music being played on Ms. Mosley's radio, and not about Plaintiff's race or sex.

Plaintiff "can satisfy the first element if she 'oppos[ed] an act of discrimination made unlawful by Title VII ("the opposition clause"), or participat[ed] in an investigation under Title VII ("the participation clause").'" Lopez, 989 F.3d at 664 (quoting Hunt v. Neb. Pub. Power Dist., 282 F.3d 1021, 1028 (8th Cir. 2002)).  Plaintiff "must show 'an objectively reasonable belief that an actionable Title VII violation has occurred for [her] complaint to qualify as a protected activity.'" Id. (quoting Gibson v. Concrete Equip. Co., Inc., 960 F.3d 1057, 1064 (8th Cir. 2020)). The applicable substantive law is used to analyze reasonableness.  Id.

Plaintiff asserts that the evidence supports the conclusion she engaged in protected activity because she "did everything she could in an attempt to stop being forced to listen to uncensored and offensive music."  (ECF No. 44 at 13.)  As discussed more fully above, Plaintiff admits the rap music was not directed to her or played because of her race or sex.  Further, Plaintiff does not establish an issue of material fact as to whether the rap music was severe or pervasive enough to

create a racially or sexually hostile work environment.  It is uncontroverted that Plaintiff did not

complain to Nike about harassment or discrimination based on her race or sex, and Plaintiff admits

she did not intend her complaints to Nike about the music to be complaints of a racially or sexually

hostile work environment.  As such, Plaintiff does not establish an issue of material fact as to

whether she reasonably believed she engaged in protected activity.  An employee's complaint

about "actions outside the ambit of an employment practice is unprotected by Title VII." Bakhtiari

v. Lutz, 507 F.3d 1132, 1137 (8th Cir. 2007).  See, e.g., Hunt, 282 F.3d at 1028 (no protected

activity where plaintiff complained she was entitled to a pay raise but did not attribute employer's

failure to give her a raise to sex discrimination); Ray v. Health Consultants Inc., No. 4:19-CV-

3052 JAR, 2020 WL 1640359, at *3 (E.D. Mo. Apr. 2, 2020) (no protected activity because

plaintiff did not complain to his employer about harassment or discrimination based on gender);

Johnson, 2018 WL 5393665, at *3 (no protected conduct where Black female plaintiff reported

that white male employee hit her in the head with a frozen water bottle but did not allege that he

did so because of her sex or race); Dunbar v. Johnson, No. 4:17-CV-2649 NAB, 2017 WL

6387694, at *2 (E.D. Mo. Dec. 14, 2017) (no protected activity where plaintiff complained about

harassment and disparate treatment but did not complain the conduct was based on race, religion,

national origin, color, gender, disability, age, or any other factor).  As a result, Nike is entitled to

summary judgment on this claim.

### 2. *Plaintiff Did Not Suffer a Materially Adverse Action*

Nike also argues it is entitled to summary judgment because it did not take any adverse

action against Plaintiff.  To establish an adverse action in the context of her retaliation claim,

Plaintiff is not limited to discriminatory actions that affect the terms and conditions of her

employment, Burlington N., 548 U.S. at 64, but instead must show that a reasonable employee

would have found Nike's actions "materially adverse," meaning they "well might have dissuaded

a reasonable worker from making or supporting a charge of discrimination." Id. at 68.  Plaintiff "can meet that showing if 'a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Lopez, 989 F.3d at 664-65 (quoting AuBuchon v. Geithner, 743 F.3d 638, 642 (8th Cir. 2014)).

Plaintiff identifies the challenged retaliatory adverse actions as the November 26, 2017 incident between Plaintiff and her coworker Ms. Mosley that culminated in the latter forcefully grabbing Plaintiff's arm and waist, and Ms. Mosley's coming to the A shift on January 25, 2018. The question is whether the two actions by Ms. Mosley were materially adverse, and "would have dissuaded a reasonable worker from participating a Title VII investigation or action involving [Nike.]"  See Carpenter, 481 F.3d at 618 (analyzing retaliatory harassment claim in context of coworker conduct).

While the one-time physical incident with Ms. Mosley was subjectively upsetting for Plaintiff, the Court finds it was not a materially adverse action or objectively severe enough to rise to the level of actionable harassment for the reasons discussed above in connection with Plaintiff's racially hostile work environment claim.  See Oncale, 523 U.S. at 80-81 (Title VII "does not prohibit all verbal or physical harassment").  Further, as discussed above, there is no evidence the physical contact was related to Plaintiff's race or sex, and Plaintiff admits Ms. Mosley's action occurred after the two exchanged words about the music being played and then Plaintiff attempted to unplug Ms. Mosley's radio.  See Palesch, 233 F.3d at 566-67 (white female employee complained that coworkers and supervisors ignored her, she was isolated from office social activities, and a Black female coworker "damaged her car, shoved her against a wall, and threatened her with bodily harm," but failed to show a nexus between the complained-of harassment and her race and gender, and admitted to non-discriminatory explanations for her co-

workers' behavior).  The Court finds this incident would not have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Plaintiff contends "the fact that Nike knew Mosley assaulted [her] and failed to terminate her in and of itself establishes Nike failed to take prompt and appropriate corrective action."  (ECF No. 44 at 14.)  As previously stated, the fact that Plaintiff desired a harsher response does not make Nike's response ineffective.  See Crawford., 665 F.3d at 984.  "Federal courts . . . are not in the business of micromanaging or second-guessing companies' internal investigations" and "must afford an appropriate degree of deference to business judgment" where the record shows that the employer conducted a reasonable investigation in good faith.  Adams, 538 F.3d at 930 (citing cases).  Further, Ms. Mosley's one-time visit to Plaintiff's work area approximately two months the incident and Plaintiff's transfer to the A shift, during which Plaintiff admits Mosley neither looked at nor spoke to her, does not amount to a materially adverse action by Ms. Mosley or Nike as it was objectively neither hostile nor abusive.  Plaintiff admits she "understood and accepted" that she "may still see Ms. Mosley" after she transferred to the A shift, SOF ¶ 65, and the only basis for Plaintiff's belief that Mosley was there for the purpose of harassing and intimidating her is Plaintiff's understanding that Mosley was not scheduled to work the A shift.  There is also no evidence Nike directed Mosely to visit Plaintiff's work area.  Cf. Carpenter, 481 F.3d at 619 (employer's failure to stop co-worker's racial comments about and to plaintiff, and co-worker's misloading and placing garbage in plaintiff's work trailer did not rise about the type of trivial harm that will not deter victims of discrimination from complaining to the EEOC; reiterating that "petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.").  Ms. Mosley's presence in Plaintiff's work area on one occasion is a minor annoyance or trivial harm that would not have dissuaded a reasonable worker from participating in Title VII protected conduct.

In sum, the Court finds that even if Plaintiff had engaged in protected activity, Mosley's conduct was not so severe and pervasive as to have dissuaded a reasonable worker from participating in protected conduct. Plaintiff therefore does not establish the second element of her prima facie case.

### 3. *Plaintiff Fails to Establish a Causal Connection*

Finally, Plaintiff does not show sufficient evidence to establish a genuine issue of material fact as to the third element, a causal connection between her complaint to her supervisor about the rap music and the actions of her coworker, Ms. Mosley.[12] To establish a causal connection, "a plaintiff must prove an employer's retaliatory motive played a part in the adverse . . . action." Hughes v. Stottlemyre, 454 F.3d 791, 797 (8th Cir. 2006) (cited case omitted). "Evidence that gives rise to an inference of a retaliatory motive on the part of the employer is sufficient to prove a causal connection." Id. (quoted case omitted). "An employee must show that the employer had actual or constructive knowledge of the protected activity in order to establish unlawful retaliation." Hervey v. County of Koochiching, 527 F.3d 711, 722 (8th Cir. 2008).

Here, Plaintiff must show that her coworker Ms. Mosley, the alleged retaliator, had actual or constructive notice of the protected activity, and provide evidence sufficient to give rise to an inference of a retaliatory motive on the coworker's part. Plaintiff establishes only that Ms. Mosley was present at the meeting in September 2017 when their supervisor talked about Nike's policy concerning music. Plaintiff attempts to rely on admitted speculation and her own unsubstantiated opinion testimony to establish that Ms. Mosley knew Plaintiff was the person who had complained.

---

[12]Plaintiff's complaint to her supervisor about the rap music is the only alleged protected conduct she engaged in prior to her coworker's actions that Plaintiff alleges are retaliatory. The Court therefore does not consider Plaintiff's email complaints in this context. See Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034, 1044 (8th Cir. 2007) ("Regarding temporal proximity, alleged retaliation which precedes protected conduct cannot logically be used to show causation because a prior event cannot be caused by a later event.").

This is insufficient.  Without admissible evidence that Ms. Mosley had actual or constructive notice that Plaintiff complained about the music, Plaintiff cannot establish a causal connection between her complaint about the music and Ms. Mosley's actions.  Cf. Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034, 1045 (8th Cir. 2007) (no causal connection existed where "[t]here is no evidence . . . to suggest what [the plaintiff's coworkers] may have known about Stewart's complaint, or when or how these [coworkers] may have learned of her complaint."); see Robinson v. Potter, 453 F.3d 990, 994 (8th Cir. 2006) ("decision-makers must have awareness of the protected activity.").

Further, although Plaintiff complains that Nike did not terminate Ms. Mosley after the November 26, 2017 incident, the record shows no reason for Nike to consider disciplinary action against her prior to that incident.  As a result, Plaintiff cannot establish that Nike's failure to prevent Mosley's forceful grabbing of Plaintiff on November 26, 2017 was an act by Nike which would have dissuaded a reasonable worker from participating in Title VII-protected activity.  See Carpenter, 481 F.3d at 618 ("Thus, the question is whether [employer's] failure to stop [coworker's] conduct and comments was an act which would have dissuaded a reasonable worker from participating in a Title VII investigation or action involving [employer].").  Nike's failure to prevent the second alleged retaliatory act, when Ms. Mosley came into Plaintiff's work area in January 2018, two months later, would not dissuade a reasonable worker from participating in protected activity.

The evidence of record is insufficient to allow a reasonable jury to draw the reasonable inference that any adverse actions or hostile environment Plaintiff complains of were based on her September 2017 complaint about music.  See id. at 1045-46.

**Conclusion**

"Even if some factual dispute exists, the movant is entitled to summary judgment if the evidence, taken as a whole, is so one-sided that a fair-minded trier of fact could not find for the nonmoving party." Ball, 870 F.3d at 727 (citing Anderson, 477 U.S. at 252).  That is the case here. As to each cause of action, the evidence of record as a whole could not lead a rational trier of fact to find for Plaintiff.  For the reasons discussed above, the Court will grant Nike's motion for summary judgment in all respects.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Nike IHM, Inc.'s Motion for Summary Judgment (ECF No. 33) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Stay Pending Appeal (ECF No. 50) is **DENIED** as moot.

An appropriate Judgment will accompany this Memorandum and Order.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

Dated this 26th day of April, 2021.